IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SEAMUS JOHNSTON, | ) | |
| Plaintiff | ) | |
| vs. | ) | CIVIL ACTION NO. 13-213 |
| UNIVERSITY OF PITTSBURGH OF | ) | |
| THE COMMONWEALTH SYSTEM OF | ) | |
| HIGHER EDUCATION d/b/a | ) | DEMAND FOR JURY TRIAL |
| UNIVERSITY OF PITTSBURGH, | ) | |
| ERIC KINSEY, | ) | |
| MARK A. NORDENBERG, | ) | |
| JONATHAN WESCOTT, | ) | RECEIVED |
| MATTHEW UPDYKE, | ) | |
| NANCY TURNER, | ) | SEP 1 2013 |
| DANIEL W. DUNN, | ) | CLERK, U.S. DISTRICT COURT |
| PAUL J. EASH, | ) | WEST. DIST. OF PENNSYLVANIA |
| and Does 1 through 10, inclusive | ) | |
| Defendant | ) | |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

**JURISDICTION**

1. This action arises pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 and 42 U.S.C. § 2000(c-8) for the deprivation of Plaintiffs' rights under the Fourteenth Amendment to the Constitution of the United States, Title IX of the Education Amendments of 1972 codified as 20 U.S.C. §1681 and the associated regulations at 34 C.F.R. § 106.21 et seq., and the Human Relations Act and the Fair Educational Opportunities Act of the Commonwealth of Pennsylvania.

1

2. This Court has jurisdiction to hear the claims under 28 U.S.C. § 1331, 28 U.S.C. § 1343.

3. Venue is proper in regards to 28 U.S.C. § 1391, because the Defendant has its main campus in the Western District of Pennsylvania, where a substantial part of these events occurred.

## PARTIES

4. Plaintiff Seamus Johnston ("Mr. Johnston") is a former undergraduate Computer Science major of the University of Pittsburgh's Johnstown Branch Campus ("UPJ"), who attended and maintained honor status for five semesters from 2009 to 2011. He was permanently dismissed from the University of Pittsburgh in early 2012.

5. Defendant University of Pittsburgh of the Commonwealth System Higher Education ("University") is a Pennsylvania-based non-profit education corporation and land-grant university. The University has headquarters ("main campus") in the City of Pittsburgh, with branch campuses throughout the region.

6. Defendant Eric Kinsey is an athletic Coach in the employ of the University.

7. Defendant Mark A. Nordenberg is Chancellor of the University.

8. Defendant Jonathan Wescott was Vice President for Student Affairs at UPJ. He is no longer employed in that position.

9. Defendant Matthew Updyke is a member of the UPJ Campus Police force.

10. Defendant Nancy Turner is a member of the UPJ Campus Police force.

11. Defendant Daniel W. Dunn is a member of the UPJ Campus Police force.

12. Defendant Paul J. Eash is a member of the UPJ Campus Police force.

## PRELIMINARY ALLEGATIONS

13. In or around March 2009, Mr. Johnston applied for admission to UPJ.

14. Certain of Mr. Johnston's application materials contained the erroneous sex designation of female and Mr. Johnston listed his sex as female on his UPJ application to avoid any discrepancies that might result in his application being delayed or denied.

15. Mr. Johnston was admitted and awarded the REB Commuter Scholarship. The scholarship provides funds for needy, full-time, commuting students who are local graduates. It is a four-year scholarship covering full tuition, fees, and books. Recipients must maintain a 3.25 GPA freshman year, 3.30 GPA sophomore year, and 3.35 GPA junior year to renew the scholarship.

16. Mr. Johnston earned the scholarship the entire time he was enrolled.

17. In or around August 2009, Mr. Johnston enrolled at UPJ.

18. At no point during the enrollment was Mr. Johnston asked to provide proof of sex.

19. At the time of his enrollment and at all times since then, Mr. Johnston identified and lived openly as male, including using men's restrooms.

20. In Fall 2011, Mr. Johnston presented UPJ with proof of a name change in the form of a notarized affidavit. UPJ changed the name on his student records to Seamus Samuel Padraig Johnston.

21. During the Spring 2011 semester, Mr. Johnston enrolled in a for-credit men's weight training class. He used the men's locker room throughout the semester.

22. In Fall 2011, Mr. Johnston again enrolled in a for-credit men's weight training class. He used the men's locker room approximately five times between the end of August and mid-September.

23. On or around September 19, 2011, Mr. Johnston met with Teresa Horner, executive director of Health & Wellness Services, per her request.

24. Ms. Horner informed him that he could no longer use the men's locker room. Because using the female locker rooms was not a realistic option for him, Mr. Johnston agreed to the temporary use of a unisex locker room at the Sports Center normally reserved for referees.

25. Mr. Johnston is known to be male to his family physician, the Social Security Administration, the Selective Service, the U.S. Department of State, and the Pennsylvania Department of Transportation.

## COUNT ONE:

### Discrimination and Retaliation under the Education Amendments of 1972

26. Plaintiff Seamus Johnston re-alleges paragraphs 13-25 as though set forth in full.

27. Plaintiff Seamus Johnston alleges paragraphs 66-77 as though set forth in full.

28. On or around October 19, 2011, Mr. Johnston emailed a letter to Jem Spectar, Ph.D., President of UPJ, to register a complaint regarding his exclusion from the locker room.

29. Mr. Johnston sent copies of this letter to Chancellor Mark A. Nordenberg, Provost Patricia E. Beeson, and General Counsel Jerome Cochran at main campus.

30. The Office of the Chancellor has final arbitration power in conflicts within the University and the discretionary power to end situations of discrimination.

31. In response President Spectar sent a letter dated October 21, 2011, reiterating that the only way Mr. Johnston could access the men's locker room was by officially changing his gender status in the university through a court order or birth certificate change.

32. On or around October 24, 2011, Mr. Johnston responded to Dr. Spectar, stating his intention to resume use of the men's locker room on October 24, 2011 and asking that his letter be considered as the filing of a grievance for harassment.

33. The men's weight-training class met on Mondays and Wednesdays of each week.

34. Mr. Johnston used the men's locker room approximately six times from October 24, 2011 – November 14, 2011.

35. The week of November 14, 2011, a story ran in the UPJ student newspaper, *The Advocate*, titled, "Transgender student claims discrimination." The story detailed the policy of excluding Mr. Johnston from the men's locker room and the steps he had taken to work with UPJ officials.

36. On November 16, 2011, a Wednesday, following the appearance of the article, for the first time, Mr. Johnston was issued a citation for using the men's locker room. UPJ Campus Police Sargent Turner and Officer Daniel Wade Dunn showed up at the weight training class and informed Mr. Johnston that he could not use the men's locker room. Officer Dunn wrote a citation for disorderly conduct. The citation was later withdrawn on December 13, 2011.

37. The following Monday, November 21, 2011, three Campus Police officers confronted Mr. Johnston outside of the locker rooms and issued him a second citation for disorderly conduct for using the men's locker room. Campus Police Chief Kevin Grady was also present and informed Mr. Johnston that if he continued, he would be arrested and taken into custody. Associate Chief of Campus Police, Eric Zangaglia, informed Mr. Johnston that he was being cited a second time because they did not have enough officers to arrest him for defiant trespass. Officer Paul Eash wrote up a citation for disorderly conduct. The citation was later withdrawn on December 12, 2011.

38. On the same day, November 21, 2011, Jacob W. Harper, Coordinator at the UPJ Office of Student Conduct and Conflict Resolution sent Mr. Johnston a letter notifying him that,

5

due to the events of the day, Mr. Johnston was issued an Interim Persona Non Grata, prohibiting him from visiting male locker rooms within the Sports Center at UPJ.

39. Also on November 21, 2011, Mr. Harper issued Mr. Johnston a letter stating "This notice is being sent to you to make known that disciplinary charges have been filed against you regarding an incident which occurred on November 16, 2011 at Sports Center...As such, your presence is required...on November 23, 2011, at 10:00 AM." The hearing was rescheduled for December 2, 2011. On November 29, 2011, Mr. Harper issued a notice of hearing that Mr. Johnston must appear at a hearing on December 2, 2011.

40. There was no class on November 23, 2011, a Wednesday.

41. On Monday, November 28, 2011, Mr. Harper issued Mr. Johnston an Interim Persona Non Grata from the entire Sports Center for his continued use of the men's locker room. This precluded Mr. Johnston from the referee's locker room, which was located in the Sports Center.

42. At the student code of conduct hearing on December 2, 2011, Mr. Johnston faced three charges resulting from alleged violations of the Student Code of Conduct: "Offenses Related to the Operation of the University/14. Engages in conduct which is disorderly, lewd, or indecent; breach of peace; or aiding, abetting or procuring another to do the same"; "Offenses Related to the Operation of the University/3. Fails without just cause to comply with the lawful directions of a University official acting in the performance of his or her duties and authority"; and "Offenses Related to Property/7. Enters or uses facilities or property of another person or the University without consent or authorization." Hearing Officer Dr. Jerry Samples informed Mr. Johnston that he was found guilty on all charges and notified him that he was not to be using male facilities.

43. On December 9, 2011, James Gyure, Ph.D., Vice President for Enrollment Services and Planning in the Office of Student Conduct and Conflict Resolution, issued a letter confirming that Mr. Johnston had been found guilty of the three violations he was charged with. Mr. Johnston was sanctioned with needing to undergo a counseling assessment by January 16 as well as to satisfy any prescriptive treatment, a year of disciplinary probation until December 31, 2012, and persona non grata in all male designated facilities until graduation.

44. On or about December 20, 2011, Mr. Harper called and emailed Mr. Johnston to inform him that due to Mr. Johnston's use of the men's restrooms on December 7 and 15, Mr. Johnston was subject to interim disciplinary suspension and an interim persona non grata for all University property, both effective until after adjudication.

45. On January 24, 2012, a disciplinary hearing was held in which Mr. Johnston was charged with the same violations as the December 2, 2011 hearing. Mr. Johnston was found guilty of exhibiting disorderly, lewd or indecent behavior, failing to comply with lawful directions of a University official, and entering University facilities without authorization. The sanction issued was "disciplinary dismissal," i.e., expulsion with no chance for re-admittance to the University and includes being an automatic persona non grata on all UPJ property.

46. On February 2, 2012, Dr. Gyure issued a sanction justification review upholding Mr. Johnston's expulsion. UPJ based its decision, among other things, on its assertion that other students would be "uncomfortable" sharing a locker room or restroom with a transsexual student.

47. On February 23, 2012, Mr. Johnston petitioned the University Appeals Board for an

appeal. On February 29, 2012, the Board was authorized to review the case.

48. Having been expelled, Mr. Johnston was unable to attend UPJ in the Spring 2012 and has lost his scholarship.

49. Mr. Johnston is protected under the category of sex. Mr. Johnston's sex is male, and he is also a male who was erroneously assigned female at birth.

50. UPJ denied Mr. Johnston access to the men's locker room and men's restrooms because of his sex, perceived sex, stereotypes about his sex, and because he had changed his sex.

51. UPJ also denied Mr. Johnston access to the men's locker room because it allegedly had a policy of basing access to the men's locker room on the sex designated in UPJ student records. UPJ refused to update the sex on Mr. Johnston's student records from female to male when presented with reasonable evidence of the error.

52. Mr. Johnston's use of the men's locker room and men's restrooms did not interfere with other student's use of the locker room or restrooms.

53. Mr. Johnston was expected to use a unisex locker room designed for referees that no other student is required to use.

54. Mr. Johnston was disciplined for using the men's locker room and subjected to mandatory counseling and treatment, disciplinary probation, interim suspension and various interim and permanent persona non grata orders because of his sex, perceived sex, stereotypes about his sex, and because he had changed his sex.

55. Mr. Johnston was disciplined in the form of expulsion following two times where he was observed using men's restrooms. He was expelled ostensibly because he used men's facilities while having a female sex designation on his student records. He would not have been subject to discipline if UPJ had not refused to correct the sex designation on

his student records.

56. On December 2, 2011, the UPJ Campus Police filed a criminal complaint (docket number: CP-11-CR-0000590-2012), charging Mr. Johnston with violations of 18 Pa.C.S.A. § 3127(a) – Indecent Exposure (M2), 18 Pa.C.S.A. § 3503(b)(1)(i)– Criminal Trespass (M3), and 18 Pa.C.S.A. § 5503(a)(1) – Disorderly Conduct (M3).

57. On May 30, 2013, after multiple attempts over 16 months to get the charges dismissed or withdrawn for lack of probable cause, Mr. Johnston pled guilty to the reduced charges of Trespass (S) and Disorderly Conduct (S).

58. On January 20, 2012, Mr. Johnston presented his story of discrimination at a meeting of the University Senate Anti-Discriminatory Policies Committee ("ADPC") in Pittsburgh.

59. On February 21, 2012, the ADPC unanimously passed a resolution recommending that the University nondiscrimination policy should operate according to the sex with which the person identifies now, not their natal sex, noting that birth-certificate verification might be in violation of the University's Non-Discrimination Policy and city ordinances, and that this should apply to all regional campuses.

60. On March 20, 2012, the University responded by sending a representative through the Office of General Counsel, name undisclosed, to appear at a meeting of the ADPC and informed them that students must act in accordance with their birth certificate.

61. Upon information and belief, this was the first time the University had ever formally announced a policy with regard to use of gendered facilities.

62. Upon information and belief, the University's discriminatory actions against Mr. Johnston were part of a pattern and practice of sex discrimination against transgender, gender non-conforming, non-binary gender, and intersex individuals.

63. Upon information and belief, the actions of the Defendants named herein were at times conducted with the supervision, instruction, approval, or collaboration of others unknown to the Plaintiff.

64. Subsequent to his expulsion, Mr. Johnston was investigated by the FBI for potential involvement in a series of bomb threats against the University; however, charges against Mr. Johnston were never filed in conjunction with that investigation.

65. Upon information and belief, the University gave Mr. Johnston's name to the FBI in a retaliatory furtherance of their discriminatory conduct.

## COUNT TWO:

### Discrimination under the Pennsylvania Human Relations Act

66. Plaintiff Seamus Johnston re-alleges paragraphs 13-65 as though set forth in full.

67. On or around September 20, 2011, Mr. Johnston approached Jonathan Wescott, UPJ Vice President of Student Affairs, to whom he had been directed to find out what steps he could take to regain access to the men's locker room. At a meeting on or around September 26, 2011, Mr. Wescott informed Mr. Johnston that he would be allowed to use the men's locker room if his student records were updated from female to male.

68. On September 26, 2011, Mr. Johnston met with the UPJ Campus Registrar, Marylin Alberter, to learn how to change the sex designation on his student records. Ms. Alberter said she would have to check with counsel at the main campus.

69. On September 29, 2011, Marylin Alberter sent Mr. Johnston an email stating in part, "After our conversation Monday afternoon I contacted Ted Fritz, an attorney in the Office of University Counsel at the Pittsburgh campus, for direction on your request. He advised me that since you identified your gender at the point of admission as female the

University would require either a court order or a new birth certificate reflecting your current gender."

70. On October 5, 2011, Mr. Johnston replied to Ms. Alberter's email and asked for the specific policy or law citations that were the basis of the decision.

71. Mr. Johnston also emailed Mr. Westcott indicating he would attempt to change his student records and also asked for "exact law and policy citations regarding my use of gendered facilities." Mr. Westcott replied that his position remained the same and encouraged Mr. Johnston to pursue changing his student records.

72. On October 6, 2011, Mr. Johnston emailed Mr. Westcott indicating he "remain[ed] cooperative in our temporary agreement [to use the referee's locker room]" and noted again that no University policy pertaining to his use of male-designated facilities had yet been cited.

73. On November 28, 2011, Campus Police including Chief Kevin Grady and a Richland Township officer confronted Mr. Johnston outside of the locker rooms prior to his weight training class. He was taken temporarily into custody. Campus Police Officer Nancy Turner issued another disorderly conduct citation, but it was never filed.

74. On December 7, 2011, Mr. Johnston had to attend the final class of his for-credit weight training class, a class in which participation counted toward the grade. Mr. Johnston changed into his gym shorts in a stall of a men's restroom in the Wellness Center specifically in an effort to comply with the November 28, 2011 Interim Persona Non Grata, which precluded him from accessing all locker rooms in the Sports Center, including the unisex referee's locker room. Campus Police Officer Matthew Updyke arrived and informed Mr. Johnston he was not to be using the men's restrooms.

75. On December 15, 2011, Mr. Johnston used the men's restroom in Biddle, an academic building. Campus Police Officer Matthew Updyke saw this and informed Mr. Johnston he was not to be using men's restrooms and that he would file a complaint with the University Hearing Board.

## COUNT THREE:

### Discrimination under Pennsylvania Fair Educational Opportunities Act

76. Plaintiff Seamus Johnston re-alleges paragraphs 13-75 as though set forth in full.

77. On November 16, 2011 and again on November 28 and, upon information and belief, at other times, Eric Kinsey contacted Campus Police, aiding, abetting or inciting them to confront Mr. Johnston in his routine, class-related use of the men's facilities in the Sports Center and Wellness Center and deny him use of those facilities.

## COUNT FOUR:

### Common Law Breach of Contract

78. Plaintiff Seamus Johnston re-alleges paragraphs 13-77 as though set forth in full.

79. The University's nondiscrimination policy (Policy 07-01-03) holds that discrimination or harassment on the basis of "gender identity and expression" is prohibited. Retaliation against those who make claims or give information of discrimination is also prohibited.

80. The clause of "gender identity and expression" was adopted in 2008.

81. Mr. Johnston reasonably relied on the fulfillment of this obligation in expressing the gender identity most comfortable to him, male.

82. The Student Code of Conduct, provided in hard copy to Mr. Johnston on enrollment contains rights and privileges accorded to students, including:

> "To engage in peaceful, orderly, and nondestructive picketing, protests, and demonstrations, to the extent that they do not violate public law and do

not interfere with the educational process or the rights of other members of the University. [. . .] To organize one's own personal behavior as long as such behavior does not violate public law or the rights of others and does not interfere with the educational process."

83. Mr. Johnston reasonably relied on these promised rights and privileges in protesting, peacefully and without hindrance to any other student, the discriminatory actions of the University.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully request that this Court grant the following relief:

a.  Enter a judgment that Defendant's actions and practices as set forth herein are in violation of the laws of the United States;

b.  Award Plaintiff compensatory damages, including lost grant and scholarship monies, interest on student debt since expulsion, lost potential wages, humiliation, emotional suffering, and punitive damages;

c.  Award Plaintiff the costs of this action, including, where appropriate, the fees and costs of experts and reasonable attorneys' fees;

d.  Grant Plaintiff such further relief as this Court finds necessary and proper.

Or in the alternative:

a.  Injunctive relief in the form of an order reinstating the Plaintiff with all prior academic credits, honors, and scholarships, including such paperwork as is necessary to explain the error to federal and state financial aid providers, private lenders, and credit institutions.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues of fact and damages in this action.

## AVERMENT

I apologize to the Court for my lack of experience in drafting legal documents and aver that the foregoing facts are true and correct to the best of my knowledge, information, and belief.

RESPECTFULLY SUBMITTED,

*[signature]*

Seamus Johnston, *pro se*
1047 Church Ave, Fl 3
Johnstown, PA 15901
jspjohnston@gmail.com
(814) 317 – 6874

Dated: September 16, 2013