**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

_____
                                                    )
SEAMUS JOHNSTON,                                    )
                                                    )
                                                    )
                                   Plaintiff,       )   Civ. No. 3:13-cv-213-KRG-KAP
                                                    )
                     v.                             )
                                                    )   Honorable Kim R. Gibson
UNIVERSITY OF PITTSBURGH, et al.,                   )   Magistrate Judge Keith A. Pesto
                                                    )
                                                    )   Electronically Filed
                                   Defendants.      )
_____           )


**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION**
**TO DEFENDANTS' MOTION TO DISMISS**
**SECOND AMENDED COMPLAINT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................................... 1

FACTUAL BACKGROUND ................................................................................................... 4

ARGUMENT ........................................................................................................................... 10

I.  MR. JOHNSTON HAS ADEQUATELY PLEADED THAT DEFENDANTS
    DISCRIMINATED AGAINST HIM ON THE BASIS OF SEX UNDER THE EQUAL
    PROTECTION CLAUSE, TITLE IX, THE PHRA, AND THE PFEOA ....................... 11

    A.  Mr. Johnston Has Properly Pleaded Facts that Constitute Sex Discrimination
        Under Title IX. ................................................................................................... 11

    B.  Mr. Johnston Has Properly Pleaded Facts that Constitute Sex Discrimination
        Under the Equal Protection Clause. .................................................................... 19

    C.  Mr. Johnston Has Properly Pleaded Facts that Constitute Sex Discrimination
        Under the PHRA and the PFEOA. ...................................................................... 27

II. MR. JOHNSTON HAS ASSERTED A VALID CLAIM AGAINST THE
    DEFENDANTS FOR RETALIATION UNDER TITLE IX, THE PHRA, AND THE
    PFEOA ....................................................................................................................... 29

III. MR. JOHNSTON HAS ASSERTED A VALID BREACH OF CONTRACT CLAIM
     AGAINST THE UNIVERSITY ................................................................................. 34

CONCLUSION ........................................................................................................................ 36

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alston v. Parker*,
    363 F.3d 229 (3d Cir. 2004)..........................................................................28

*Andreoli v. Gates*,
    482 F.3d 641 (2007)........................................................................................33

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)........................................................................................10

*Atkinson v. Lafayette College*,
    460 F.3d 447 (3d Cir. 2006)..........................................................................27

*Barb v. Miles, Inc.*,
    861 F. Supp. 356 (W.D. Pa. 1994)................................................................27

*Barr v. Cmty. Coll. Of Beaver County*,
    968 A.2d 235 (Pa. Commw. Ct. 2009)..........................................................34

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)........................................................................................10

*Berry* v. *Stevinson Chevrolet*,
    74 F.3d 980 (10th Cir. 1996)........................................................................32

*Brown v. Zavaras*,
    63 F.3d 967 (10th Cir. 1995)........................................................................25

*Burlington N. & Santa Fe Ry. v. White*,
    548 U.S. 53 (2006)......................................................................................31-33

*California Education Committee, LLC v. O'Connell*,
    No. 34-2008-00026507-CU-CR-GDS, slip op. (Cal. Super. Ct. June 1, 2009)...............24

*Connelly v. Steel Valley Sch. Dist.*,
    706 F.3d 209 (3d Cir. 2013)..........................................................................10

*Cradle of Liberty Council, Inc. v. City of Philadelphia*,
    Civil Action No. 08-2429, 2008 WL 4399025 (E.D. Pa. Sept. 25, 2008) ........................26

*Crosby v. Reynolds*,
    763 F. Supp. 666 (D. Me. 1991) ...................................................................23

*Cruzan v. Special Sch. Dist. No. 1*,
    294 F.3d 981 (8th Cir. 2002).........................................................................23

*Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*,
  450 F.3d 130 (3d Cir. 2006)..................................................................... 30

*Curtis v. Cargill Meat Solutions Corp.*,
  No. 3:CV-06-513, 2006 U.S. Dist. LEXIS 64634 (M.D. Pa. June 16, 2006) .................. 35

*Dawn L. v. Greater Johnstown Sch. Dist.*,
  586 F. Supp. 2d 332 (W.D. Pa. 2008) ............................................................ 29

*Dept. of Fair Employment and Housing v. American Pac. Corp.*,
  34-2013-00151153-CU-CR-CDS, slip op. (Cal. Super. Ct. Mar. 13, 2014).................... 24

*Doe v. Brockton Sch. Comm.*,
  No. 2000-J-638, 2000 WL 33342399 (Mass. App. Ct. Nov. 30, 2000)........................... 17

*Doe v. Regional School Unit 26*,
  No. Pen-12-582, 2014 WL 325906 (Me. Jan. 30, 2014).................................... 20

*Doe v. Yunits*,
  No. 001060A, 2000 WL 33162199 (Mass. Super. Ct. Oct. 11, 2000)............................. 17

*Doucet v. Univ. of Cincinnati*,
  No. 1:05CV148, 2006 WL 2044955 (S.D. Ohio July 19, 2006)........................... 32

*Farrell v. Planters Lifesavers Co.*,
  206 F.3d 271 (3d Cir. 2000)................................................................ 32, 33

*Fowler v. UPMC Shadyside*,
  578 F.3d 203 (3d Cir. 2009)................................................................... 10

*Franklin v. Gwinnet County Pub. Sch.*,
  503 U.S. 60 (1992) ............................................................................ 13

*Frontiero v. Richardson*,
  411 U.S. 677 (1973) ......................................................................... 21

*Gainor v. Ventiv Commercial Servs., LLC*,
  No. 13cv00117, 2013 WL 3912523 (W.D. Pa. July 29, 2013)........................... 10

*Gilbert v. Am. Airlines, Inc.*,
  No. 01 C 3088, 2004 WL 783362 (N.D. Ill. Jan. 7, 2004)................................ 32

*Gjeka v. Del. County Cmty. Coll.*,
  Civil Action No. 12-4548, 2013 WL 2257727 (E.D. Pa. May 23, 2013) ........................ 34

*Glenn v. Brumby*,
  663 F.3d 1312 (11th Cir. 2011)................................................... 13, 15, 17, 20

*Griswold v. Connecticut,*
    381 U.S. 479 (1965) ............................................................................................... 22

*In re Heilig,*
    816 A.2d 68 (Md. 2003) ......................................................................................... 25

*In re Lovo-Lara,*
    23 I&N Dec. 746 (BIA 2005) ................................................................................. 25

*Jackson v. Birmingham Bd. of Educ.,*
    544 U.S. 167 (2005) ......................................................................................... 14, 29

*Jalil v. Avdel Corp.,*
    873 F.2d 701 (3d Cir. 1989) .................................................................................. 33

*Kastel v. Winnetska Bd. of Education,*
    946 F. Supp. 1329 (N.D. Ill. 1996) ....................................................................... 26

*Kelly v. Drexel Univ.,*
    94 F.3d 102 (3d Cir. 1996) .................................................................................... 27

*Kerrigan v. Comm'r of Pub. Health,*
    289 Conn. 135 (2008) ............................................................................................ 21

*Kovacevich v. Vanderbilt Univ.,*
    No. 3:09-0068, 2010 WL 1492581 (M.D. Tenn. Apr. 12, 2010)........................... 32

*Lawrence v. Texas,*
    539 U.S. 558 (2003) ............................................................................................... 22

*Logan v. Gary Cmty. Sch.,*
    No. 2:07-CV-431, 2008 WL 4411518 (N.D. Ind. Sept. 25, 2008) ...................... 17

*Macy v. Holder,*
    EEOC Appeal. No. 0120120821, 2012 WL 1435995 (Apr. 20, 2012)............................ 14

*Mathis v. Fountain-Fort Carson Sch. Dist. 8,*
    Charge No. P20130034X, Colo. Div. Civ. Rights (June 17, 2013) ...................... 21

*Mayle v. Felix,*
    545 U.S. 644 (2005) ............................................................................................... 27

*Merrow v. Goldberg,*
    672 F. Supp. 766 (D. Vt. 1987) ............................................................................ 34

*Miles v. N.Y. Univ.,*
    979 F. Supp. 248 (S.D.N.Y. 1997) ............................................................ 13, 17, 18

*Mississippi University for Women v. Hogan*,
    458 U.S. 718 (1982) ............................................................................. 19

*Mitchell v. Axcan Scandipharm, Inc.*,
    No. Civ. A. 05-243, 2006 WL 456173 (W.D. Pa. Feb. 17, 2006) ............................ 13, 28

*Moore v. City of Philadelphia*,
    461 F.3d 331 (3d Cir. 2006) ...................................................................... 30

*Morosetti v. Louisiana Land and Exploration Co.*,
    522 Pa. 492 (Pa. 1989) ........................................................................... 35

*Oncale v. Sundowner Offshore Services Inc.*,
    523 U.S. 75 (1998) ................................................................................ 17

*Phillips v. County of Allegheny*,
    515 F.3d 224 (3d Cir. 2008) ...................................................................... 10

*Price Waterhouse v. Hopkins*,
    490 U.S. 228 (1989) .............................................................................. 15

*Releford v. Pa. State Univ.*,
    No. 10-cv-1621, 2011 WL 900946 (M.D. Pa. Mar. 14, 2011) ............................... 28

*Robinson v. Se. Pa. Transp. Auth.*,
    982 F.2d 892 (3d Cir. 1993) ...................................................................... 33

*Roe v. Wade*,
    410 U.S. 113 (1973) .............................................................................. 22

*Scheidemantle v. Slippery Rock Univ.*,
    470 F.3d 535 (3d Cir. 2006) ...................................................................... 29

*Schroer v. Billington*,
    424 F. Supp. 2d 203 (D.D.C. 2006) ............................................................. 25

*Schroer v. Billington*,
    577 F.Supp.2d 293 (D.D.C. 2008) .............................................................. 13

*Schwenk v. Hartford*,
    204 F.3d 1187 (9th Cir. 2000) ................................................................... 13

*Sell v. BC Int'l Group*,
    No. 13cv0215, 2013 WL 2147859 (W.D. Pa. May 16, 2013) ............................... 11

*Smith v. City of Salem*,
    378 F.3d 566 (6th Cir. 2004) ..................................................................... 13

*Stacy v. LSI Corp.*,
No. 5:10-CV-04693-ER, 2011 WL 10773442 (E.D. Pa. Jan. 3, 2011)............................28

*Swartley v. Hoffner*,
734 A.2d 915 (Pa. Super. 1999)...................................................................34

*Traxler v. Mifflin County Sch. Dist.*,
Civil No. 1:07-CV-1275, 2008 WL 717852 (M.D. Pa. Mar. 17, 2008)........................28

*U.S. v. Carolene Prods. Co.*,
304 U.S. 144 (1938)...............................................................................21

*United States v. Virginia*,
518 U.S. 515 (1996)...............................................................................19

*Weston v. Pennsylvania*,
251 F.3d 420 (3d Cir. 2001).....................................................................29

*Wheeler v. Voicestream Wireless Servs.*,
No. Civ. A. 3:03-CV-1916, 2005 WL 1240797 (M.D. Pa. May 24, 2005) ....................28

*Williams v. Runyon*,
130 F.3d 568 (3d Cir. 1997).....................................................................28

*Woodson v. Scott Paper Co.*,
109 F.3d 913 (3d Cir. 1997).....................................................................32

*Yeager v. UPMC Horizon*,
698 F. Supp. 2d 523 (W.D. Pa. 2010)........................................................29

**Statutes**

20 U.S.C. § 1681(a) (2012)......................................................................12

42 U.S.C. § 1983 (2006) .........................................................................11

43 Pa. Cons. Stat. § 962 ..........................................................................28

Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et seq.* ...............11

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 *et seq.*........................12

**Other Authorities**

RESOLUTION AGREEMENT BETWEEN ARCADIA UNIFIED SCH. DIST., THE U.S. DEP'T OF EDUC.,
OFFICE FOR CIVIL RIGHTS & THE U.S DEP'T OF JUSTICE, CIVIL RIGHTS. DIV., OCR CASE
NO. 09-12-1020, DOJ CASE NO. 169-12C-70 (July 24, 2013) ..........................16

U.S. DEP'T OF JUSTICE, CIVIL RIGHTS DIV. & U.S. DEP'T OF EDUC., OFFICE FOR CIVIL RIGHTS, LETTER TO ASAF ORR RE CONCLUSION OF INVESTIGATION IN DOJ CASE NO. DJ169-12C-79, OCR CASE NO. 09-12-1020 (July 24, 2013)...............................................................15

U.S. OFFICE OF PERS. MGMT., GUIDANCE REGARDING THE EMPLOYMENT OF TRANSGENDER INDIVIDUALS IN THE FED. WORKPLACE (2011)...................................................................23

University of Pittsburgh Policy 07-01-03, dated March 25, 2010 ...................................................5

**Rules**

Fed. R. Civ. P. 15(c) ...................................................................................................................27

**Regulations**

34 C.F.R. §§ 106.11, 106.31(b)(3), (b)(4), (b)(7) (2013)...........................................................12

**Constitutional Provisions**

U.S. Const. amend. XIV, § 1 ......................................................................................................11

Plaintiff Seamus Johnston ("Mr. Johnston") respectfully submits this Memorandum of Law in Opposition to the Motion to Dismiss Second Amended Complaint filed by the University of Pittsburgh (the "University"), University officials, and members of the campus police of the University of Pittsburgh at Johnstown (collectively, the "Defendants").

## INTRODUCTION

This case is about whether a university and its officials may, consistent with state and federal anti-discrimination laws and the Equal Protection Clause of the U.S. Constitution, freely discriminate against one of its students based on his sex and transgender status, stigmatize and harass him, and, in retaliation for asserting claims of discrimination, ultimately expel him, cause him to lose his scholarship, and falsely accuse him of making illegal bomb threats. The answer, in short, is no: this conduct is discrimination that is prohibited under our state and federal laws and the U.S. Constitution.

Mr. Johnston is a former undergraduate honors student of the University. He is legally, socially, and medically recognized as a male, and he consistently lived as a man and used the men's facilities while at the University. The events giving rise to this action took place in the fall 2011 semester during Mr. Johnston's junior year. Although Mr. Johnston, who was enrolled in a men's weight training class, had, consistent with his male identity, been using the men's locker room without incident for more than a semester, the University and campus police officers suddenly and inexplicably began a systematic campaign of harassment and discrimination against Mr. Johnston based on his sex and status as a transgender individual. The University prohibited him from using the men's facilities in the Sports Center and forced him to use an inferior gender-neutral locker room segregated from other male students. When asked to justify its discriminatory conduct, the University told Mr. Johnston (whose driver's license, passport, and social security card all confirm that he is male) that he could once again use the University

facilities appropriate to his male gender only if he could provide a court order or birth certificate "proving" his male identity, thus imposing an arbitrary burden on Mr. Johnston that it imposed on no other male students.

After Mr. Johnston complained about this discriminatory treatment, Defendants ramped up their campaign of discrimination.  They brought disorderly conduct charges against him. Campus police repeatedly harassed him.  He was barred from *all* locker room facilities, and given no explanation of where he was expected to change into gym clothes prior to the gym class in which he was enrolled.  He was declared a "persona non grata" on University property. Ultimately, he was expelled from the University and lost his scholarship.  Even after he was expelled, the University continued to press with criminal charges against Mr. Johnston for trespass and disorderly conduct for using the men's restroom and, without any basis and in a move that can only be understood as retaliatory for his complaints of discrimination, the University falsely gave his name to the FBI as a suspect in a series of bomb threats.  This systematic persecution, humiliation, and discrimination of Mr. Johnston severely injured him. He has suffered significant emotional distress, humiliation, stress, depression, and anxiety as a result of Defendants' actions.

These and other facts support Mr. Johnston's claims against Defendants — the University, University officials involved in the discriminatory actions described in the Complaint, and campus police officers — for illegal discrimination under Title IX of the Education Amendments of 1972, the Equal Protection Clause of the U.S. Constitution and anti-discrimination laws of the Commonwealth of Pennsylvania.  Defendants ask this Court to dismiss all of Mr. Johnston's claims, chiefly on the basis that these anti-discrimination laws and the U.S. Constitution allegedly do not prohibit discrimination on the basis of "gender identity, gender expression, or gender transition as legally protected classifications."  Defendants'

arguments have no merit.

Defendants misrepresent Mr. Johnston's Complaint as alleging discrimination merely on the basis of his transgender status.  In fact, Mr. Johnston has alleged acts of discrimination "because of his sex" and his "perceived failure to conform to gender stereotypes" (2d Am. Compl. ¶105).  Defendants also completely ignore the extensive body of case law that explicitly recognizes claims of discrimination on the basis of sex by transgender individuals under Title IX and similar federal and state anti-discrimination laws.  Indeed, federal courts, including several circuit courts, as well as federal agencies charged with enforcing anti-discrimination laws, are near-unanimous in holding that these laws prohibit sex discrimination based on an individual's transgender status or gender nonconformity, as here.  Moreover, courts and federal enforcement agencies have explicitly held that the very conduct at issue here — the University's refusal to permit Mr. Johnston, a male transgender individual, access to facilities consistent with his male gender — is unlawfully discriminatory under federal anti-discrimination law.  Defendants also argue that Congress did not intend to include explicit protections against discrimination against transgender people when it passed Title IX.  Defendants' resort to "plain language" and legislative intent is unavailing.  Indeed, courts (including the U.S. Supreme Court) have explicitly rejected these arguments in addressing the reach of anti-discrimination statutes like Title IX.

Defendants' argument that their discriminatory conduct gets a free pass under the Equal Protection Clause because "transgender" is not a "suspect classification" fares no better.  First, Mr. Johnston's complaint alleges *sex* discrimination by Defendants, and courts have explicitly recognized claims of sex discrimination by transgender individuals, as here.  Second, even if Mr. Johnston's claims are viewed outside of the subset of claims of sex discrimination, Defendants' discriminatory actions are subject to heightened scrutiny, as Mr. Johnston is a member of the

transgender community, a politically powerless minority that has experienced a history of discrimination.  Third, even if Defendants need only advance a rational, non-discriminatory reason for their discriminatory treatment, they have failed to do so.  Defendants' purported concern with "protect[ing] the privacy rights of all students," whom they claim should not have to be subjected to sharing a locker room or restroom with a transgender person, relies only on inapposite U.S. Supreme Court case law addressing limits to government intrusion on privacy related to sexual intimacy.  Moreover, courts have repeatedly and consistently held that sharing public restrooms or locker room facilities with a transgender person is simply not a cognizable harm.  Defendants' post-hoc rationalization for their discriminatory treatment of Mr. Johnston is not even coherent:  indeed, the University's (unwritten) policy as announced to Mr. Johnston would have allowed a transgender student of a female "biological" sex to use male facilities once he submits a court order or birth certificate "proving" his male sex.  And fourth, courts have held that a defendant's reliance on an allegedly non-discriminatory justification for discriminatory actions implicates questions of fact that cannot be resolved on a motion to dismiss.

For these and other reasons set forth below, Defendants' motion to dismiss should be denied.

### FACTUAL BACKGROUND

Plaintiff Seamus Johnston is a former undergraduate honors student at the University of Pittsburgh's Johnstown Branch Campus (the "University").  2d Am. Compl. at ¶7.  Defendant University of Pittsburgh of the Commonwealth System of Higher Education is a Pennsylvania-based, non-profit education corporation and land-grant university.  *Id.* at ¶8.

The University has enacted a non-discrimination policy that explicitly prohibits discrimination or harassment on the basis of "gender identity and expression."  *Id.* at ¶127.  The non-discrimination policy also prohibits retaliation against anyone who makes claims of

discrimination or reports information related to discrimination to any authority.  *Id.*; *see* University of Pittsburgh Policy 07-01-03, dated March 25, 2010, *available at* https://www.cfo.pitt.edu/policies/policy/07/07-01-03.html.

Mr. Johnston is legally, socially, and medically recognized as a male.  2d Am. Compl. at ¶18.  Mr. Johnston's driver's license, passport, and social security record identify him as male. *Id.* at ¶¶29, 31-32.  As required for male U.S. citizens, he is registered for the Selective Service. *Id.* at ¶30.  He is also transgender.  *Id.* at ¶18.  He was assigned the sex of female at birth, but identifies and lives as a man.  *Id.*  He first informed his parents that he was a boy when he was nine years old.  *Id.* at ¶20.  Since August 2011, he has been taking testosterone to further his gender transition, which causes the development of male secondary sex characteristics, including increased muscle mass, deepening of the voice, and facial and body hair growth.  *Id.* at ¶26.

Mr. Johnston enrolled at the University in August 2009.  *Id.* at ¶37.  While at the University, Mr. Johnston consistently lived as male and was perceived by others to be male.  *Id.* at ¶38.  Throughout the nearly three years he was enrolled as a student, Mr. Johnston consistently used men's restrooms on campus without incident.  *Id.* at ¶42.  The University permitted Mr. Johnston to enroll in a men's weight training class for the spring semester of 2011.  *Id.* at ¶43. Mr. Johnston consistently used the men's locker room for this class without incident throughout the entire spring 2011 semester.  *Id.* at ¶44.

In the fall 2011 semester, Mr. Johnston again enrolled in the men's weight training class. *Id.* at ¶45.  He continued using the men's locker room from the beginning of the semester through mid-September without issue.  *Id.*  On September 19, 2011, Teresa Horner, executive director of Health & Wellness Services, suddenly and inexplicably informed Mr. Johnston that he could no longer use the men's locker room.  *Id.* at ¶¶46-47.  At her insistence, and because use of the female locker room was not an option due to his obviously male appearance, Mr.

Johnston agreed to the temporary use of a unisex locker room at the Sports Center normally reserved for referees — a far smaller locker room that was two flights of stairs from the nearest scale, which was critical to Mr. Johnston's training.  *Id.* at ¶48.  Mr. Johnston felt humiliated, isolated, and stigmatized to be required to use the referees' locker room and to be singularly excluded from the men's locker room unlike all other male students.  *Id.* at ¶49.

The day after his conversation with Ms. Horner, Mr. Johnston asked Jonathan Wescott, the University's Vice President of Student Affairs, what he would need to do to regain access to the men's locker room.  *Id.* at ¶50.  Mr. Wescott told him that he would not be allowed to use the men's locker room unless the gender marker in his University records was updated from female to male.  *Id.*  On September 29, 2011, Marylin Alberter, the University's Campus Registrar, clarified that the University would require either a court order or a new birth certificate reflecting his male gender to update his gender marker in the University system.  *Id.* at ¶52.

On October 19, 2011, Mr. Johnston registered a complaint with Jem Spectar, the University's President, protesting his exclusion from the men's locker room.  *Id.* at ¶57.  President Spectar reiterated that Mr. Johnston would continue to be barred from using the men's locker room unless he submitted a court order or a birth certificate to prove his male identity.  *Id.* at ¶58.  In October 2011, Mr. Johnston offered his Pennsylvania driver's license to Ms. Alberter (which listed his gender as male) as proof that the State recognized him as male.  *Id.* at ¶55.  The University refused to accept the driver's license and continued barring him from the men's locker room.  *Id.*  The University never cited any policy or legal authority that supported its refusal to allow Mr. Johnston access to the men's locker room, despite Mr. Johnston's repeated requests.  *Id.* at ¶¶53-54, 56.  As a result of this discriminatory treatment, Mr. Johnston became increasingly depressed and distressed and considered dropping out of school.  *Id.* at ¶49.

Eventually, Mr. Johnston refused to accept the discriminatory, stigmatizing separate

locker room and, consistent with his male gender, resumed using the men's locker room. Mr. Johnston used the men's locker room approximately six times between October 24, 2011 and November 14, 2011, each time without incident. *Id.* at ¶59.

On November 16, 2011, two campus police officers appeared after Mr. Johnston's weight training class and cited Mr. Johnston for disorderly conduct, *solely* on the basis of his using the men's locker room. *Id.* at ¶60. Mr. Johnston was distressed and frightened by this encounter, and fearful that other students would witness the interaction and potentially learn of his transgender status, which could cause him to be isolated further and make him a target for violence. *Id.* A second disorderly conduct citation followed on November 21, 2011. *Id.* at ¶62. Campus Police Chief Kevin Grady threatened Mr. Johnston that, if he continued using the men's locker rooms, he would be arrested and taken into custody. *Id.* The University issued Mr. Johnston a letter designating him what it termed an "Interim Persona Non Grata" and barring him from all men's locker rooms within the University Sports Center. *Id.* at ¶63. On November 28, 2011, the University issued a second "Interim Persona Non Grata," which barred him from the entire Sports Center, including even the referees' locker room that the University had earlier forced him to use. *Id.* at ¶65. Mr. Johnston, however, was still enrolled in the for-credit men's weight training class for which participation was necessary as part of his grade. *Id.* at ¶67. No explanation was given by the University regarding where he was supposed to change for class, now that he was prohibited from accessing all locker room facilities.

The University brought Mr. Johnston before a disciplinary hearing on December 2, 2011. He was found guilty of violating provisions of the Student Code of Conduct prohibiting "disorderly, lewd, or indecent" conduct, failing to comply with "lawful directions" of the University, and using "facilities or property of another person or the University without consent or authorization." *Id.* at ¶68. Severe sanctions were imposed on Mr. Johnston: he was

designated a "persona non grata," barring him from all male-designated campus facilities until he graduated from the University; the University placed him on disciplinary probation until December 31, 2012; and he was directed to undergo a counseling assessment. *Id.* at ¶69. Again, the University provided no explanation regarding which facilities Mr. Johnston *could* use.

Mr. Johnston's final for-credit weight training class was on December 7, 2011. *Id.* at ¶67. Having been barred from using all locker rooms at the Sports Center (including the referees' locker room), Mr. Johnston changed into his gym shorts in a stall of a men's restroom in the Wellness Center (located outside the Sports Center). *Id.* Upon exiting the restroom, Mr. Johnston was approached by Campus Police Office Matthew Updyke, who had been waiting for him in the hallway. *Id.* Officer Updyke scolded Mr. Johnston that he was not to use any men's restroom on campus. *Id.* On December 15, Mr. Johnston used a men's restroom in an academic building on the University's campus. *Id.* at ¶70. Mr. Johnston again was confronted by Officer Updyke, who told him he would file a complaint with the University Hearing Board. *Id.* at ¶70. The constant harassment by University police made Mr. Johnston feel persecuted, exhausted, and despondent. *Id.* at ¶67. Because of his use of the men's restrooms on campus on December 7 and 15, Mr. Johnston was placed on interim disciplinary suspension and designated an interim "persona non grata" for *all* University property, effective immediately. *Id.* at ¶71.

On January 24, 2012, Mr. Johnston was called to another disciplinary hearing, this time before a panel of students. *Id.* at ¶72. On account of his use of male restrooms and locker room facilities, Mr. Johnston was found guilty of exhibiting disorderly, lewd, or indecent behavior, failing to comply with lawful directions of the University, and entering University facilities without authorization. *Id.* The disciplinary board sanctioned him with "disciplinary dismissal" — an expulsion with no chance of re-admittance to the University or its property. *Id.* The sanction was upheld by Dr. James Gyure, Vice President for Enrollment Services and Planning

in the University's Office of Student Conduct and Conflict Resolution, after a "sanction justification review" on February 2, 2012 and later by the University Appeals Board. *Id.* at ¶¶69, 73, 75. As a result, Mr. Johnston was barred from attending the University beginning in the spring semester of 2012. *Id.* at ¶76. As a result, he lost his scholarship. *Id.*

Mr. Johnston's expulsion from the University was not the only punishment imposed upon him. On December 2, 2011, the University Campus Police filed a criminal complaint against Mr. Johnston for Indecent Exposure (M2), Criminal Trespass (M3), and Disorderly Conduct (M3). *Id.* at ¶77. After multiple attempts to dismiss the charges for lack of probable cause, Mr. Johnston pled guilty to the reduced charges of Trespass (S) and Disorderly Conduct (S) on May 30, 2013. *Id.* at ¶78. He was sentenced to six months probation and issued approximately $600 in fines. *Id.* Later, after he had been expelled from the University, for reasons that appear retaliatory, the University gave Mr. Johnston's name to the FBI as a suspect for involvement in a series of bomb threats. *Id.* at ¶¶83-84. Following an investigation, no charges against Mr. Johnston were ever filed. *Id.* The government later prosecuted Adam Stuart Busby of Dublin, Ireland, and no one else, for making the false bomb threats. *Id.* at ¶83.

The University's discriminatory expulsion of Mr. Johnston and its retaliation against him caused him to suffer significant emotional distress, humiliation, stress, depression, and anxiety. *Id.* at ¶85. As a result of the University's conduct toward him, Mr. Johnston was diagnosed with Post-Traumatic Stress Disorder and is currently undergoing treatment. *Id.* at ¶86. He has not been able to enroll in any other school and has not been gainfully employed since the incidents. *Id.* at ¶87. He also has difficulty sleeping and is often overcome by intense bouts of fear, anger, and sadness. *Id.* at ¶88.

Mr. Johnston was expelled from the University because he exercised his right to use the men's facilities on campus, consistent with his male gender, as he had done for several years

without any complaints or incident.  These facts (the truth of which must be presumed on a

motion to dismiss) firmly support his claims against the Defendants for discrimination,

retaliation, and breach of contract.

### ARGUMENT

In considering a motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure,

federal courts will permit a complaint to proceed so long as it contains "a short and plain

statement of the claim showing that the pleader is entitled to relief, in order to give the defendant

fair notice of what the . . . claim is and the grounds on which it rests."  *Bell Atlantic Corp. v.

Twombly*, 550 U.S. 544, 555 (2007) (citation and internal quotation marks omitted); *see also

Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

The Third Circuit has held a district court must use a three-part test to determine the

sufficiency of a complaint under *Twombly* and *Iqbal*:

> First, the court must take note of the elements a plaintiff must plead to state a
> claim.  Second, the court should identify allegations that, because they are no
> more than conclusions, are not entitled to the assumption of truth.  Finally, where
> there are well-pleaded factual allegations, a court should assume their veracity
> and then determine whether they plausibly give rise to an entitlement for relief.

*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013) (citation omitted).

A district court may not dismiss a complaint "merely because it appears unlikely that the

plaintiff can prove those facts or will ultimately prevail on the merits."  *Phillips v. County of

Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).  Rather, a plaintiff need only allege "enough facts

to raise a reasonable expectation that discovery will reveal evidence of the necessary

element[s]."  *Id.* at 234 (*citing Twombly*, 550 U.S. at 555).  A complaint that alleges facts that

explain "how, when, and where" is sufficient to survive a motion to dismiss.  *Fowler v. UPMC

Shadyside*, 578 F.3d 203, 212 (3d Cir. 2009); *see also Gainor v. Ventiv Commercial Servs., LLC*,

No. 13cv00117, 2013 WL 3912523, at *2 (W.D. Pa. July 29, 2013) (denying motion to dismiss

complaint alleging Title VII violations, recognizing that "a Complaint that provides adequate facts to establish 'how, when, and where' will survive a Motion to Dismiss"); *Sell v. BC Int'l Group*, No. 13cv0215, 2013 WL 2147859, at *3 (W.D. Pa. May 16, 2013) (same).

I.    **MR. JOHNSTON HAS ADEQUATELY PLEADED THAT DEFENDANTS DISCRIMINATED AGAINST HIM ON THE BASIS OF SEX UNDER THE EQUAL PROTECTION CLAUSE, TITLE IX, THE PHRA, AND THE PFEOA**

For the reasons set forth below, Mr. Johnston has adequately pleaded claims of discrimination on the basis of sex by Defendants under Title IX of the Education Amendments of 1972 (20 U.S.C. §§ 1681 *et seq.*) ("Title IX"), the Equal Protection Clause of the Fourteenth Amendment,[1] the Pennsylvania Human Relations Act ("PHRA"), and the Pennsylvania Fair Educational Opportunities Act ("PFEOA").[2]  The U.S. Constitution and each of the foregoing statutes prohibit sex discrimination, which includes a prohibition of discrimination based on transgender status.  By expelling Mr. Johnston for using University facilities consistent with his male gender, for the sole reason that he is transgender, and by retaliating against him for complaining of discriminatory treatment, Defendants violated Mr. Johnston's constitutional rights and applicable non-discrimination laws.

A.    **Mr. Johnston Has Properly Pleaded Facts that Constitute Sex Discrimination Under Title IX.**

Mr. Johnston has properly pleaded discrimination based on sex under Title IX.  Title IX provides that "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education

---

[1]    The Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

[2]    Because Mr. Johnston has adequately pleaded that Defendants have violated his rights under the U.S. Constitution and several federal statutes, Section 1983 entitles Mr. Johnston to relief.  *See* 42 U.S.C. § 1983 (2006).

program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a) (2012). This prohibition applies to educational institutions that receive federal financial assistance, such as the University. *See* 34 C.F.R. § 106.11 (2013). The Department of Education's implementing regulations under Title IX provide that a school may not "[d]eny any person any . . . aid, benefit, or service," or "[o]therwise limit any person in the enjoyment of any right, privilege, advantage, or opportunity" on the basis of sex. *Id.* at § 106.31(b)(3), (b)(7). The regulations also provide that a school may not "[s]ubject any person to separate or different rules of behavior, sanctions, or other treatment" on the basis of sex. *Id.* at § 106.31(b)(4).

Defendants argue that Title IX does not prohibit the University's discrimination against Mr. Johnston because the statutory prohibition does not cover discrimination based on "gender identity, gender expression, and/or gender transition." *See* Defendants' Br. in Supp. of Defendants' Mot. to Dismiss Second Am. Compl. ("MTD") at 9. That is a misstatement of the law and a mischaracterization of the Complaint. In fact, Mr. Johnston alleges discrimination on the basis of his *sex*, as well as his transgender status and perceived gender nonconformity. 2d Am. Compl. ¶¶102, 105. Moreover, Defendants rely solely on the "statutory language of Title IX" and legislative history to support their argument, but they virtually ignore the extensive body of federal case law addressing claims brought by transgender plaintiffs under federal anti-discrimination laws like Title IX. Those courts, as well as federal agencies charged with enforcing anti-discrimination laws, have nearly unanimously held that sex discrimination laws like Title IX prohibit discrimination based on an individual's transgender status or gender nonconformity.

The term "sex" in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 *et seq.*, an analogous federal statute that prohibits discrimination in employment, long has been understood to encompass discrimination based on gender nonconformity and transgender status.

Since at least 2000, federal courts and agencies have been near-unanimous in holding that the prohibition of sex discrimination in Title VII and analogous statutes extends to discrimination against transgender individuals.  *See, e.g.*, *Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011) ("[D]iscrimination against a transgender individual because of her gender-nonconformity is sex discrimination, whether it's described as being on the basis of sex or gender."); *Smith v. City of Salem*, 378 F.3d 566, 572 (6th Cir. 2004) (transgender employee stated claim for discrimination under Title VII and Equal Protection Clause based on her suspension from job because of transgender status); *Schwenk v. Hartford*, 204 F.3d 1187, 1202 (9th Cir. 2000) (upholding claim brought by transgender prisoner under Violence Against Women Act (VAWA), remarking that under Title VII and VAWA, "the terms 'sex' and 'gender' have become interchangeable"); *Schroer v. Billington*, 577 F.Supp.2d 293, 308 (D.D.C. 2008) (holding that an agency's rescission of a job offer to a transgender woman "after being advised that she planned to [undergo] sex reassignment surgery was literally discrimination 'because of…sex'" that was prohibited under Title VII); *Mitchell v. Axcan Scandipharm, Inc.*, No. Civ. A. 05-243, 2006 WL 456173, at *2 (W.D. Pa. Feb. 17, 2006) (holding that transgender plaintiff had "sufficiently pleaded claims of gender discrimination" under Title VII and PHRA on basis of discrimination for "failure to conform to sex stereotypes of how a man should look and behave" and denied defendant's motion to dismiss).

This Title VII case law is directly applicable to claims of discrimination under Title IX. Courts interpret both statutes' prohibitions of sex discrimination consistently.  *See, e.g.*, *Franklin v. Gwinnet County Pub. Sch.*, 503 U.S. 60, 75 (1992) (addressing claim under Title IX while relying upon Title VII case law to determine what constitutes harassment "on the basis of sex"); *Miles v. N.Y. Univ.*, 979 F. Supp. 248, 250 n. 4 (S.D.N.Y. 1997) (where transgender student brought sexual harassment suit, Court recognized "it is now established that the Title IX term 'on

the basis of sex' is interpreted in the same manner as similar language in Title VII").[3] Additionally, as discussed below, government agencies charged with enforcing Title IX have recognized that Title VII decisions regarding the scope of sex discrimination protections are directly applicable to Title IX claims.

Particularly instructive is *Macy v. Holder*, an administrative decision in which the Equal Employment Opportunity Commission (the "Commission") — the federal agency charged with enforcing Title VII — held that discrimination against a person because of that person's transgender status is prohibited sex discrimination.  EEOC Appeal. No. 0120120821, 2012 WL 1435995, at *7-9 (Apr. 20, 2012).  In that case, a job offer was withdrawn after the applicant revealed that she was transgender.  *Id.* at *1.  The Commission unanimously concluded that the claim was cognizable under Title VII, holding that "intentional discrimination against a transgender individual because that person is transgender is, by definition, discrimination 'based on . . . sex,' and such discrimination therefore violates Title VII."  *Id.* at *10-11.  The Commission explained:

> When an employer discriminates against someone because the person is transgender, the employer has engaged in disparate treatment "related to the sex of the victim."   This is true regardless of whether an employer discriminates against an employee because that individual has expressed his or her gender in a non-stereotypical fashion, because the employer is uncomfortable with the fact the person has transitioned or is in the process of transitioning from one gender to another, or because the employer simply does not like that the person is identifying as a transgender person.  In each of these circumstances, the employer is making a gender-based evaluation, thus violating the Supreme Court's admonition that "an employer may not take gender into account in making an employment decision."

---

3    The Supreme Court has recognized that the scope of Title IX's discrimination prohibition is *broader* than that of Title VII.  *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005) ("Title IX is a broadly written general prohibition on discrimination, followed by specific, narrow exceptions to that broad prohibition. . . . By contrast, Title VII spells out in greater detail the conduct that constitutes discrimination in violation of that statute.").

*Id.* (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 244 (1989)).

In reaching this conclusion, the EEOC relied, in part, on the Supreme Court's seminal decision *Price Waterhouse v. Hopkins* 490 U.S. 228 (1989), in which the Supreme Court held that discrimination against an employee for failing to conform to gender-based expectations violates Title VII — in other words, that penalizing an employee for failing to conform to sex stereotypes is itself a form of sex discrimination that is forbidden under the law. *Id.* at 250-51 (plurality opinion); *see also id.* at 258-61 (White, J., concurring); *id.* at 272-73 (O'Connor, J., concurring). As the EEOC noted in *Macy*, just as discrimination based on perceived gender nonconformity is a form of unlawful sex discrimination, so, too, is discrimination based on transgender status, since the very nature of such discrimination is rooted in discomfort with the transgender person's perceived violation of gender stereotypes.[4]

Likewise, the government agencies charged with enforcing Title IX have recognized that those Title VII's decisions regarding the scope of sex-discrimination protections are applicable to transgender students under Title IX. For instance, in 2013, the U.S. Department of Justice and Department of Education investigated California's Arcadia Unified School District for failing to permit a transgender boy to use the boys' restrooms, locker rooms, and other sex-segregated facilities. *See* U.S. DEP'T OF JUSTICE, CIVIL RIGHTS DIV. & U.S. DEP'T OF EDUC., OFFICE FOR CIVIL RIGHTS, LETTER TO ASAF ORR re CONCLUSION OF INVESTIGATION IN DOJ CASE NO. DJ169-12C-79, OCR CASE NO. 09-12-1020 (July 24, 2013), *available at* http://www.nclrights.org/wp-

---

4  Recent federal circuit court cases are in accord. *See, e.g., Brumby*, 663 F.3d at 1316 ("A person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes.").

content/uploads/2013/09/Arcadia_Notification_Letter_07.24.2013.pdf.  The student, who was assigned the female sex at birth, had lived as a boy full-time since the spring of his fifth grade year.  *Id.* at 2.  The government's investigation found that he was "consistently . . . accepted and treated as a boy by his [middle-school] classmates and teachers," only some of whom knew of his transgender status.  *Id.* at 3.  Citing "generalized concerns about safety and privacy," the school refused to allow him to use boys' restrooms or locker rooms, and instead required him to use a private, gender-neutral restroom in the nurse's office as a restroom and a place to change for gym class.  *Id.* at 3-4.  The arrangement made the student uncomfortable "because it made him feel 'different'" and subjected him to unwanted questions from other students.  *Id.* at 4.

The letter from the Department of Justice and Department of Education concluding the investigation noted that "[t]here is no dispute the District treated the student differently than other students because of his gender identity."  *Id.*  The letter cited to *Macy v. Holder* (EEOC), *Glenn v Brumby* (11th Cir.), *Smith v. City of Salem* (6th Cir.), and *Schroer v. Billington* (D.D.C.) for the proposition that Title VII protects transgender individuals from discrimination based on their gender nonconformity or transgender status, *id.* at 2 n.3, and explained that "[c]ourts rely on Title VII precedent to analyze discrimination 'on the basis of sex' under Title IX."  *Id.*  Under a Voluntary Resolution Agreement,[5] the district agreed "to permit the Student to use male-designated facilities at school and on school-sponsored trips and to otherwise treat the Student as a boy in all respects."  *Id*. at 7.  The district also committed to change its policies and train staff to ensure that it "treat[s] . . . other transgender students . . . in a nondiscriminatory manner."  *Id.*

---

5        *See* RESOLUTION AGREEMENT BETWEEN ARCADIA UNIFIED SCH. DIST., THE U.S. DEP'T OF EDUC., OFFICE FOR CIVIL RIGHTS & THE U.S DEP'T OF JUSTICE, CIVIL RIGHTS. DIV., OCR CASE NO. 09-12-1020, DOJ CASE NO. 169-12C-70 (July 24, 2013), *available at* http://www.justice.gov/crt/about/edu/documents/arcadiaagree.pdf.

Moreover, courts that have considered the issue have found consistently that Title IX's prohibition of sex discrimination protects transgender students from discrimination.  *See Miles v. N.Y. Univ.*, 979 F. Supp. 248, 250 (S.D.N.Y. 1997) (upholding complaint by transgender student brought under Title IX arising out of professor's alleged sexual harassment of student); *Logan v. Gary Cmty. Sch.*, No. 2:07-CV-431, 2008 WL 4411518, at *1, 5 (N.D. Ind. Sept. 25, 2008) (refusing to dismiss Title IX claim where transgender student was denied entry to prom for wearing a dress).  *Cf. Doe v. Yunits*, No. 001060A, 2000 WL 33162199 (Mass. Super. Ct. Oct. 11, 2000) (disciplining transgender girl for wearing female clothes permitted for non-transgender female students was gender discrimination), *aff'd sub nom. Doe v. Brockton Sch. Comm.*, No. 2000-J-638, 2000 WL 33342399 (Mass. App. Ct. Nov. 30, 2000).

Defendants ignore this overwhelming weight of authority.  Instead, they argue that Title IX does not prohibit such discrimination because Title IX's "statutory language" does not "mention gender identity, gender expression, and/or gender transition," and because there is no legislative history indicating Congress intended to prohibit such discrimination.  MTD at 9-10.  Courts have consistently rejected these very arguments in addressing the reach of anti-discrimination statutes like Title IX.

The Supreme Court has instructed that "it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed."  *Oncale v. Sundowner Offshore Services Inc.*, 523 U.S. 75, 80 (1998) (concluding that sexual harassment of males by males was prohibited by Title VII, despite the fact that members of Congress likely did not contemplate this fact pattern when enacting the law).  Accordingly, courts have held that whatever "original intent" may be inferred from statements of legislators from around the time of the passage of statutes like Title VII and Title IX must "not be given weight in interpreting" such statutes.  *See, e.g.*, *Brumby*, 663 F.3d at 1318 n.5 (11th Cir. 2011) ("The pre-*Price Waterhouse*

17

cases' reliance on the presumed intent of Title VII's drafters is [ ] inconsistent with *Oncale* . . . , where the Supreme Court held that original intent must not be given controlling weight in interpreting Title VII."). Indeed, courts have extended Title IX to prohibit discrimination against transgender students, as here, while explicitly noting that the legislators at the time of Title IX's passage may not have anticipated every conceivable fact pattern to which Title IX may apply. *See, e.g.*, *Miles*, 979 F. Supp. at 250 ("Title IX was enacted precisely to deter [sexual harassment of a student who happened to be transgender], even though the legislators may not have had in mind the specific fact pattern here involved.").

Here, the Second Amended Complaint alleges facts demonstrating that Defendants discriminated against Mr. Johnston solely on the basis of his transgender status and/or perceived gender nonconformity (that is, Defendants' perception that Mr. Johnston did not meet their notion of a "real" man because he is transgender). Mr. Johnston has alleged that the University denied him access to the men's facilities on campus consistent with his male gender, forced him to use an inferior and separate gender-neutral locker room, repeatedly harassed him for using the men's locker room and restroom, and sanctioned and ultimately expelled him for refusing to submit to this discriminatory and abusive treatment. In short, Mr. Johnston has adequately pleaded a claim of discrimination based on sex under Title IX.[6]

---

6   Defendants' reliance on this Court's October 29, 2013 Report and Recommendation (the "R&R") is misplaced. The R&R addresses Mr. Johnston's allegations in his first complaint, and Defendants ignore that deficiencies outlined by this Court in the R&R have since been cured in the present complaint. For example, while in the R&R the Court held that there is no federal claim "solely on the basis of self identification," Dkt. No. 3 at 7, the Second Amended Complaint asserts that this is not a case merely of Mr. Johnston's "self identification" as male. Rather, the Second Amended Complaint alleges that Mr. Johnston is "legally, socially, and medically recognized as male." *See* 2d Am. Compl. at ¶¶ 18, 22-23. These facts must be accepted as true on a motion to dismiss.

**B.**     **Mr. Johnston Has Properly Pleaded Facts that Constitute Sex Discrimination Under the Equal Protection Clause.**

Under the Equal Protection Clause of the U.S. Constitution, government entities may not treat people differently based on sex unless they demonstrate an "exceedingly persuasive justification" for the disparate treatment. *United States v. Virginia* 518 U.S. 515, 533 (1996). As the Supreme Court held in *Mississippi University for Women v. Hogan*:

> [T]he party seeking to uphold a statute that classifies individuals on the basis of their gender must carry the burden of showing an exceedingly persuasive justification for the classification. The burden is met only by showing at least that the classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.

458 U.S. 718, 724 (1982) (internal citations and quotations omitted).

Although neither this Court nor the Third Circuit have had occasion to rule on a case involving claims of sex discrimination by a transgender person under the Equal Protection Clause, numerous other courts have recognized that discrimination based on gender nonconformity or transgender status is prohibited sex discrimination under the Equal Protection Clause — just as under Title VII and Title IX, as explained above — and therefore subject to heightened scrutiny. *See, e.g., Brumby*, 663 F.3d at 1313-19 (holding that a state entity engaged in prohibited sex discrimination under the Equal Protection Clause when it terminated a transgender employee because of her transgender status, stating "discrimination on this basis is a form of sex-based discrimination that is subject to heightened scrutiny under the Equal Protection Clause"); *Smith*, 378 F.3d at 577 ("The facts Smith [a transgender individual] has alleged to support his claims of gender discrimination . . . easily constitute a claim of sex discrimination grounded in the Equal Protection Clause of the Constitution, pursuant to § 1983"). As the Eleventh Circuit explained in *Brumby*, "discrimination against a transgender individual

because of her gender-nonconformity *is* sex discrimination." 663 F.3d at 1317 (emphasis added).

There is thus no merit to Defendants' argument that Mr. Johnston's Equal Protection claim fails as a matter of law because "'transgender' is not a suspect classification," and that, therefore, the more lenient "rational basis" test applies. *See* MTD at 7. While Defendants flatly mischaracterize Mr. Johnston's claim as alleging discrimination merely on the basis of his transgender status, the Second Amended Complaint, in fact, unambiguously alleges that "Defendants discriminated against Mr. Johnston *because of his sex*, including his transgender status *and his perceived failure to conform to gender stereotypes*." 2d Am. Compl. ¶105 (emphasis added). As noted above, the gender stereotype at issue is Defendants' apparent assumption that a "real" man cannot be transgender — that is, that a man cannot have been assigned the female sex at birth. *See* MTD at 3, 8 (referring to Mr. Johnston repeatedly as "biologically female").

Courts and government agencies across the country have affirmed repeatedly that non-discrimination laws prohibiting discrimination on the basis of sex, gender identity, and/or transgender status require that a transgender student must be permitted access to sex-specific spaces that are consistent with his or her gender identity. In January 2014, the Maine Supreme Court held that a school's policy requiring a transgender girl to use a separate unisex bathroom was unlawfully discriminatory. *Doe v. Regional School Unit 26*, No. Pen-12-582, 2014 WL 325906 (Me. Jan. 30, 2014) at ¶23. Similarly, in June 2013, the Colorado Division of Civil Rights found that an elementary school's decision to deny a transgender girl access to the girls' restroom violated the state's gender identity non-discrimination law, and ruled that the transgender girl must be permitted to use the girls' restroom with her peers. Determination, *Mathis v. Fountain-Fort Carson Sch. Dist. 8*, Charge No. P20130034X, Colo. Div. Civ. Rights

(June 17, 2013), *available at* http://www.transgenderlegal.org/media/uploads/doc_529.pdf.  The

agency noted the serious harm that this exclusion caused the transgender student:

> "Despite having access to other restrooms, by not permitting the charging party to use the girls' restroom the Respondent creates an environment rife with harassment and inapposite to a nurturing school atmosphere.  This deprives the Charging Party of the acceptance that all students require to excel in their learning environment, creates a barrier where none should exist, and entirely disregards the Charging Party's gender identity."

*Id.*  The U.S. Department of Justice and Department of Education also interpret Title IX's

prohibition of sex discrimination to require schools to permit transgender students access to sex-

segregated facilities on the basis of the student's gender identity, as discussed *supra* in Section

I.A.

Additionally, even outside of its protection as a subset of sex discrimination, transgender

status qualifies as a protected class under the Equal Protection Clause.  Transgender persons

easily meet the indicia identified by the Supreme Court that indicate a "suspect" or, at a

minimum, "quasi-suspect" classification:  (1) transgender persons have experienced a history of

discrimination; (2) the characteristics that distinguish members of this group have "no relation to

[their] ability to perform or contribute to society," *Frontiero v. Richardson*, 411 U.S. 677, 686

(1973) (plurality opinion); (3) "the characteristic that defines the members of the class as a

discrete group is immutable or otherwise not within their control," *Kerrigan v. Comm'r of Pub.

Health*, 289 Conn. 135, 166 (2008) (holding that discrimination against gay and lesbian people

should receive heightened scrutiny); and (4) the group is a minority or otherwise lacks political

power.  *See U.S. v. Carolene Prods. Co.*, 304 U.S. 144, 153 n.4 (1938).

Even assuming *arguendo* that Mr. Johnston's discrimination claim should be reviewed

under the "rational basis" test, which requires only that Defendants must establish a legitimate

government reason for the discrimination and that their discriminatory policy is rationally related

to that purpose, Defendants have failed to demonstrate any rational purpose for the University's discriminatory treatment. Defendants argue that there was "an obvious rational basis for the University's refusal" to allow Mr. Johnston to use the gendered university facilities: their desire "to protect the privacy rights of all students." MTD at 7. In support, Defendants rely on U.S. Supreme Court authority that they claim recognizes a fundamental, constitutional "right to disrobe and perform personal bodily functions out of the presence of members of the opposite biological sex." MTD at 7-8. But the three cases Defendants cite are wholly inapposite and concern the right to privacy from government interference in the context of sexual and marital intimacy: *Griswold v. Connecticut*, 381 U.S. 479 (1965) (recognizing constitutionally-protected right to privacy with respect to the right to use contraception), *Roe v. Wade*, 410 U.S. 113 (1973) (recognizing a woman's right to decide whether to terminate an early pregnancy), and *Lawrence v. Texas*, 539 U.S. 558 (2003) (recognizing right to be free from government interference in intimate private conduct with a person of the same sex). In each of these cases, the Supreme Court recognized a zone of privacy against *government* intrusion in the area of sexual and marital intimacy. Defendants point to no case, because none exists, that supports the notion of an alleged constitutional right not to share communal spaces with transgender individuals of the same gender. Defendants' belated "privacy" concerns for other students are a post-hoc and legally insufficient justification for their discriminatory treatment of Mr. Johnston.[7]

---

[7] Defendants also rely on the observation that "federal and state governments maintain sexually-segregated [sic] facilities." MTD at 8. That is irrelevant. The fact that governments may maintain sex-segregated facilities does not justify the University's treatment of Mr. Johnston in prohibiting him from using facilities consistent with his male identity, forcing him to use inferior facilities, humiliating and harassing him, ultimately expelling him, and falsely accusing him as the perpetrator of bomb threats against the University.

    Even if this fact were somehow relevant, Defendants ignore that governments (including the federal government) have adopted policies that workers should have equal access to

**Footnote continued**

To the contrary, federal and state courts have consistently recognized that having to share public facilities with a transgender person is simply not a cognizable harm.  For example, the Eighth Circuit in *Cruzan v. Special Sch. Dist. No. 1* dismissed a Title VII claim brought by a female school employee who objected to sharing a restroom with a transgender co-worker, concluding that the plaintiff had failed to demonstrate an adverse employment action or harassment, or anything beyond "[m]ere inconvenience," resulting from having to share a restroom with a transgender individual.  294 F.3d 981, 983-84 (8th Cir. 2002).  Here, as in *Cruzan*, Mr. Johnston's use of the public men's locker rooms and restrooms at his college caused harm to no one.  The only harm was, rather, to Mr. Johnston, who was ostracized, discriminated against, and ultimately expelled from his own college — and consequently deprived of the scholarship he had been awarded and retained by virtue of his academic excellence — for using the facilities appropriate to his gender.  *See also Crosby v. Reynolds*, 763 F. Supp. 666, 670 (D. Me. 1991) (rejecting constitutional claim brought by female prisoners who did not want to share a cell with a transgender woman prisoner); *California Education Committee, LLC v. O'Connell*,

---

Footnote continued from previous page

workplace facilities consistent with their gender identity, as a matter of "dignity and respect," and that ensure compliance with health and safety rules.  The U.S. government's own employee policy directive, for example, provides that federal agencies should permit a "transitioning employee" (that is, an employee in the process of transitioning from his or her birth-assigned sex to living in accordance with his or her gender identity) should be "allow[ed] access to restrooms and . . . locker room facilities consistent with his or her gender identity."  Such an employee "should not be required to have undergone or to provide proof of any particular medical procedure (including gender reassignment surgery) in order to have access to facilities designated for use by a particular gender."  *See* U.S. OFFICE OF PERS. MGMT., GUIDANCE REGARDING THE EMPLOYMENT OF TRANSGENDER INDIVIDUALS IN THE FED. WORKPLACE (2011), *available at* http://www.chcoc.gov/transmittals/TransmittalDetails.aspx?TransmittalID-3958.  Under the federal government's stated policy, therefore, federal agencies would be required to permit a transgender individual like Mr. Johnston "access to restrooms and . . . locker room facilities consistent with his gender identity" as a matter of "dignity and respect" and for health and safety reasons.

No. 34-2008-00026507-CU-CR-GDS, slip op. (Cal. Super. Ct. June 1, 2009), *available at* http://jurist.law.pitt.edu/pdf/caschoolgendercase.pdf (dismissing plaintiff student's claim for violation of constitutional privacy rights for having to share boys' locker room space with transgender boy, holding plaintiff's privacy rights were not violated by having to share locker room with a transgender male).

Just last month, in a case brought by the California Department of Fair Employment and Housing, a California court ruled that prohibiting a transgender man from using the men's locker room was unlawful and discriminatory.[8]  *Dept. of Fair Employment and Housing v. American Pac. Corp.,* 34-2013-00151153-CU-CR-CDS, at *1 (Cal. Super. Ct. Mar. 13, 2014), *available at* http://transgenderlawcenter.org/wp-content/uploads/2014/03/Lozano-final-order.pdf.  Plaintiff was a transgender male employee whom the defendant employer had told could not use the male locker room and restroom facilities "until his gender transition to male was 'complete' after sex reassignment surgery."  The court found "plaintiff has pled sufficient facts to state a cause of action for employment discrimination," while explicitly rejecting defendant's claim that it could deny the plaintiff use of such facilities because of the alleged "emotional discomfort" of other employees:

> Defendant's hypothetical assertions of emotional discomfort about sharing facilities with transgender individuals are no different than similar claims of discomfort in the presence of a minority group, which formed the basis for decades of racial segregation in housing, education, and access to public facilities

---

[8]     In that case, the court held that the plaintiff had stated a valid claim that the employer violated the plaintiff's rights by excluding him from the men's locker room, despite the fact that the plaintiff had not presented any documentation supporting his male gender identity.  Here, Mr. Johnston's driver's license, passport, and social security card identify him as male, and he is registered for the selective service.  Nonetheless, this was not sufficient for the University, which arbitrarily required him to procure a court order or birth certificate to "prove" his male gender. 2d Am. Compl. at ¶¶29-32.

like restrooms, locker rooms, swimming pools, eating facilities, and drinking fountains.

*Id.* at 4.

Additionally, Defendants' position — that their treatment of Mr. Johnston was not discriminatory because he was treated the same as other "biologically female" students — is contrary to well-established case law interpreting protections from discrimination based on "sex" under the Equal Protection Clause, Title IX, and Title VII that accepts current scientific understandings of sex — i.e., that a person's sex is not defined by any single biological characteristic, but instead encompasses a range of traits, including gender identity, and that gender identity (not the "biological" sex one is born into) should be understood as the most reliable indicator of sex. *See, e.g.*, *Brown v. Zavaras*, 63 F.3d 967, 971 (10th Cir. 1995) (stating that the possibility that gender identity may have a biological basis suggests reevaluating whether transgender people are a protected class for purposes of the Equal Protection Clause); *Schroer v. Billington*, 424 F. Supp. 2d 203, 211-13 (D.D.C. 2006) (recognizing that scientific observation may confirm that "sex is not a cut-and-dried" matter of chromosomes, but rather consists of "different components of biological sexuality"). *Cf. In re Heilig*, 816 A.2d 68, 73 (Md. 2003) (noting that the medical community recognizes seven different factors composing a person's sex); *In re Lovo-Lara*, 23 I&N Dec. 746, 753 (BIA 2005) ("reliance on the sex designation provided on an individual's original birth certificate is not an accurate way to determine a person's gender"). The Defendants' position ignores this well-established and judicially recognized scientific consensus — indeed, it effectively ignores that transgender individuals can exist at all. Furthermore, it also improperly ignores the very first allegation in the Complaint: Mr. Johnston, a male transgender individual, is medically recognized as male. 2d Am. Compl. at ¶1.

Furthermore, Defendants' position, which appears to be that a claim for "sex" discrimination is cognizable only if it is based on a person's "biological" sex, is also incoherent and inconsistent.  The University imposed an arbitrary burden on Mr. Johnston, requiring him to provide an amended birth certificate or court order proving his male identity, thus explicitly contemplating that it could, in fact, recognize his sex as male, despite his presumably maintaining certain "biological" indicia of femaleness, including, for example, chromosomal makeup.  2d Am. Compl. at ¶58.  In other words, despite now attempting to justify its discriminatory treatment against Mr. Johnston on the basis of his allegedly "biological" female sex, the University did not require that he change *all* aspects of his "biological" sex before using the men's facilities (nor could it).  Defendants do not even try to explain how their supposed concern for other students' "privacy" would be assuaged if Mr. Johnston had been able to provide a court order or amended birth certificate, and thereby continue using the men's facilities with the University's consent.  2d Am. Compl. at ¶¶50, 52, 54, 58.

In any event, whether the University had a legitimate interest in "protecting" non-transgender students from having to share public restrooms or locker room facilities with a transgender student is a fact-based question for trial that should not be decided as a matter of law on a motion to dismiss.  *See Kastel v. Winnetska Bd. of Education*, 946 F. Supp. 1329, 1335 (N.D. Ill. 1996) (substantive non-discriminatory justification for defendants' actions that are beyond the allegations of the complaint are "not properly considered by this Court on a motion to dismiss"); *see also Cradle of Liberty Council, Inc. v. City of Philadelphia*, Civil Action No. 08-2429, 2008 WL 4399025, at *7 (E.D. Pa. Sept. 25, 2008) (denying motion to dismiss where there

was "no rational basis for this differential treatment evident in the Complaint or in some other admissible form").[9]

### C.     Mr. Johnston Has Properly Pleaded Facts that Constitute Sex Discrimination Under the PHRA and the PFEOA.

For similar reasons as those set forth above with respect to Title IX and the Equal Protection clause, Mr. Johnston also has properly alleged a claim of discrimination under the Pennsylvania Human Relations Act ("PHRA").  Pennsylvania courts "generally interpret the PHRA in accord with its federal counterparts." *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996) (internal citation omitted); *Atkinson v. Lafayette College*, 460 F.3d 447, 454 (3d Cir. 2006) ("Claims under the PHRA are interpreted coextensively with Title VII claims."); *Barb v. Miles, Inc.*, 861 F. Supp. 356, 359 (W.D. Pa. 1994).  Just as Title VII (and by association, Title IX) prohibits discrimination based on gender, the PHRA has been interpreted to prohibit gender discrimination.  *See Mitchell v. Axcan Scandipharm, Inc.*, 2006 WL 456173, at *2 (W.D. Pa.

---

[9]      In a sentence buried in a footnote of their brief, Defendants suggest that certain of Mr. Johnston's claims under 42 U.S.C. §1983 may be untimely under case law recognizing a two-year statute of limitations period for personal injury actions, on the theory that Plaintiffs "did not plead a claim under Section 1983 until January 14, 2014 when he filed the Second Amended Complaint."  *See* MTD at 8 n.2.  None of Mr. Johnston's claims are untimely because they all "relate back" to the same series of events described in the original pleading (which Defendants concede was not untimely) — namely, the discriminatory treatment of Mr. Johnston by Defendants.  *See Mayle v. Felix*, 545 U.S. 644, 659 (2005) ("[R]elation back depends on the existence of a common 'core of operative facts' uniting the original and newly asserted claims."); *see also* Fed. R. Civ. P. 15(c) (amended complaint may "relate back" to the date of the *original* complaint where the claims in the amended pleading "arose out of the conduct, transaction, or occurrence set out or attempted to be set out in the original pleading.").

The relevant facts upon which Mr. Johnston's Section 1983 claim relies were alleged in detail in Mr. Johnston's original complaint, including allegations concerning the multiple "Interim Persona Non Grata" issued by the University for Mr. Johnston's use of the men's locker room, the campus police's criminal complaints, the University's disciplinary probation, Mr. Johnston's disciplinary suspension, his ultimate expulsion, and the University's naming him as a potential suspect in a series of bomb threats.  *See* Original Compl. at ¶¶36-38, 41-45, 56.  These are precisely the facts that give rise to Mr. Johnston's §1983 claim in the Second Amended Complaint.  *See* 2d Am. Compl. at ¶¶60, 62-63, 65, 68-69, 71-72, 77 (alleging these same facts).

Feb. 17, 2006) (holding that transgender plaintiff sufficiently pleaded claims of gender

discrimination based on transgender status under Title VII and PHRA); *see also* Brief Amicus

Curiae of the Pennsylvania Human Relations Commission in Support of Plaintiff's Opposition to

Defendant's Motion to Dismiss, *Stacy v. LSI Corp.*, No. 5:10-CV-04693-ER, 2011 WL

10773442, at *2 (E.D. Pa. Jan. 3, 2011) ("[T]here is no basis of statutory construction that

supports the conclusion that Gender Identity Disorder is categorically excluded from the

PHRA."). The PFEOA's analysis for discrimination is the same as that under the PHRA. *See,*

*e.g., Releford v. Pa. State Univ.*, No. 10-cv-1621, 2011 WL 900946, at *8 (M.D. Pa. Mar. 14,

2011) ("[T]he analysis under the PFEOA would likewise be the same.").[10] For the reasons set

---

10      Defendants also argue that Mr. Johnston's claims under the PHRA and the PFEOA
should be dismissed because of Mr. Johnston's alleged failure to exhaust the available
administrative remedies by filing a complaint with the PHRC. *See* MTD at 12. Not so.
Defendants rely on a misrepresentation of the factual record. In fact, Mr. Johnston *did* file a
complaint before the PHRC within 180 days of the alleged discrimination. His complaint was
dismissed within one year after filing that complaint, after which he re-filed his complaint in
federal court within two years of the Commission's dismissal. Mr. Johnston did exactly what
was procedurally required under these statutes. *See* 43 Pa. Cons. Stat. § 962; *see also Releford v.*
*Pa. State Univ.*, 2011 WL 900946, at *7 (M.D. Pa. Mar. 14, 2011) (procedure for "processing a
complaint and any available remedies under the PFEOA is in accordance with the PHRA" and
requires only that complainant first file a complaint with the PHRC).
       Moreover, "failure to exhaust administrative remedies is an affirmative defense" on
which the "*defendant* [not plaintiff] bears the burden of pleading and proving that the plaintiff
has failed to exhaust administrative remedies." *Williams v. Runyon*, 130 F.3d 568, 573 (3d Cir.
1997) (emphasis added). Here, beyond erroneously stating that Mr. Johnston did not file a
PHRC complaint, Defendants have not even tried to prove that Mr. Johnston failed to exhaust his
administrative remedies. *See Wheeler v. Voicestream Wireless Servs.*, No. Civ. A. 3:03-CV-
1916, 2005 WL 1240797, at *5 (M.D. Pa. May 24, 2005) (denying motion to dismiss where
"Defendants have failed to submit any evidence that Plaintiff failed to exhaust the remedies
afforded").
       In any event, were the Court to find (contrary to the factual record) that Plaintiff failed to
exhaust the administrative record, any dismissal of Mr. Johnston's PHRA and PFEOA claims on
this basis should be without prejudice to Mr. Johnston's right to amend the complaint. *See, e.g.*,
*Alston v. Parker*, 363 F.3d 229, 236 (3d Cir. 2004) ("Dismissal without leave to amend is
justified only on the grounds of bad faith, undue delay, prejudice, or futility."); *Traxler v. Mifflin*
*County Sch. Dist.*, Civil No. 1:07-CV-1275, 2008 WL 717852, at *3 (M.D. Pa. Mar. 17, 2008)

**Footnote continued**

forth above, Mr. Johnston's claims under the PHRA and PFEOA are sufficient to withstand this motion to dismiss, which should be denied in its entirety.

## II.  MR. JOHNSTON HAS ASSERTED A VALID CLAIM AGAINST THE DEFENDANTS FOR RETALIATION UNDER TITLE IX, THE PHRA, AND THE PFEOA

In addition to the discrimination Mr. Johnston suffered at the hands of Defendants, as set forth above, Mr. Johnston has properly alleged a retaliation claim against the Defendants under Title IX, the PHRA, and the PFEOA.  The Supreme Court has recognized a private right of action under Title IX "where the funding recipient retaliates against an individual because he has complained about sex discrimination."  *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 171 (2005).  Courts "apply the well-settled jurisprudence of Title VII" in determining whether there has been retaliation under Title IX.  *Dawn L. v. Greater Johnstown Sch. Dist.*, 586 F. Supp. 2d 332, 373 (W.D. Pa. 2008).  To make out a *prima facie* case of retaliation under Title IX, the plaintiff need only show that:  (i) "he . . . engaged in a protected . . . activity"; (ii) the funding recipient subjected him to "an adverse . . . action after or contemporaneously with the protected activity"; and (iii) "a causal link exists between the protected activity and the adverse action." *Id*. at 374 (*citing Weston v. Pennsylvania*, 251 F.3d 420, 430 (3d Cir. 2001)).  Courts apply the same test under the PHRA and PFEOA.  *See Yeager v. UPMC Horizon*, 698 F. Supp. 2d 523, 535 n. 2 (W.D. Pa. 2010) ("The analysis required for adjudicating plaintiff's claim under the PHRA is identical to a Title VII inquiry.  The resolution of plaintiff's retaliation claims under Title VII will be dispositive of plaintiff's retaliation claims under the PHRA.") (citing *Scheidemantle v. Slippery Rock Univ.*, 470 F.3d 535, 539 n.5 (3d Cir. 2006)).  Here, Mr.

---

**Footnote continued from previous page**

("[A] court must grant leave to amend before dismissing a complaint that is merely deficient.") (citations omitted).

Johnston has alleged a *prima facie* case of retaliation under Title IX, the PHRA, and the PFEOA.

With respect to the first prong of this three-part test, the "protected activities" that fall under Title IX include making a complaint of sexual discrimination to the courts, government agencies, or a federal "funding recipient" such as a university, or "opposing" discrimination made unlawful under Title IX. *See Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006). In making a complaint, a plaintiff "need not prove the merits of the underlying discrimination complaint"; he or she need only show a "good faith, reasonable belief that a violation existed." *Moore v. City of Philadelphia*, 461 F.3d 331, 344 (3d Cir. 2006). "'Opposition' to discrimination can take the form of 'informal protests . . . including making complaints to management.'" *Id.* at 343 (citing *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc*., 450 F.3d 130, 135 (3d Cir. 2006)).

Here, Mr. Johnston engaged in activities protected under Title IX. He complained to University administration about its discriminatory treatment on numerous occasions. After three years at the University during which time he consistently utilized men's facilities in accordance with his male gender, including two semesters enrolled in a for-credit men's weight lifting class, the University — through the executive director of Health & Wellness Services — abruptly and without justification banned him from using the men's locker room in the Sports Center, forcing him to use a unisex referees' locker room. 2d Am. Compl. at ¶¶46-48. Mr. Johnston found the abrupt change by the University to be humiliating, isolating, and stigmatizing. *Id*. at ¶49. After this discriminatory treatment, Mr. Johnston asked the Vice President of Student Affairs what he could do to regain access to the men's facilities, *id*. at ¶50, met and conferred with the Registrar in an attempt to change his student records, *id.* at ¶¶51-53, inquired of the University on what legal authority it could bar him from using the men's facilities, *id.* at ¶54, and registered an official complaint with the School President, *id.* at ¶57. The Defendants certainly knew that Mr.

Johnston objected to its discriminatory treatment of him.

Regarding the second prong of the test, the "adverse action" prong, courts require that the adverse action be "materially adverse" such that it "might well have dissuaded a reasonable [person in the plaintiff's position] from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 68-70.  Whether a slight is petty or material depends on the context in which it occurred.  *Burlington*, 548 U.S. at 69.

Here, Mr. Johnston was subjected to adverse action by Defendants after complaining of the discriminatory treatment against him.  After Mr. Johnston made his complaint of gender discrimination to the campus authorities, the Defendants responded by subjecting him to constant actions intended to bully and frighten him into dropping his claim.  After repeatedly ignoring Mr. Johnston's requests that they justify their unreasonable demand for a court order or amended birth certificate to allow him use of the men's locker room, Defendants sought to prohibit Mr. Johnston from using any men's facilities, even though he had long used men's restrooms without incident during his three year tenure at the University.  Indeed, when he attempted to change in a men's restroom in the Wellness Center (heeding the University's discriminatory demand that he not use any men's locker rooms or restrooms in the Sports Center) so that he could attend the final weight lifting class, for which his attendance was mandatory and a part of his grade, a campus police officer was waiting to confront Mr. Johnston.  From there, Defendants' adverse actions against Mr. Johnston only grew worse.  2d Am. Compl. at ¶67.  All of these actions, from being banned from the men's facilities he had used without issue for years, to harassment by University and campus police, to citations, suspension, expulsion, and withdrawal of his scholarship funds, had a palpable and adverse impact on Mr. Johnston.  *See supra* at 5-9 (listing adverse actions by Defendants against Mr. Johnston, citing Second Amended Complaint).

These acts were in direct response to Mr. Johnston's complaints of sex discrimination.

Defendants entirely ignore all of these adverse actions, claiming only that the act of "allegedly providing Plaintiff's name to the FBI as a possible suspect in the rash of bomb threats at the University in 2012, did not involve an alleged deprivation to Plaintiff of the University's education programs, benefits, activities" because by that time "Plaintiff was no longer affiliated with the University." MTD at 11.[11] This misses the point: by 2012, Mr. Johnston was no longer affiliated with the University precisely *because* of the Defendant's adverse actions against him.

With respect to the third prong, Plaintiffs must show that the adverse action was motivated by "retaliatory animus," *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000) (citation omitted), and that this animus had a "determinative effect" on the complained-of decision. *Woodson v. Scott Paper Co.*, 109 F.3d 913, 935 (3d Cir. 1997). The Court must consider "a broad array of evidence" in making its determination. *Farrell*, 206 F.3d at 284 (citation omitted). Plaintiffs must show that the party taking the adverse actions was aware of

---

[11]    Under Title VII (the analogous statute to Title IX), an employer effectively can retaliate against an employee by "taking actions not directly related to his employment or by causing him harm *outside* the workplace." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 63 (2006) (emphasis added); *see also Berry v. Stevinson Chevrolet*, 74 F.3d 980, 984-88 (10th Cir. 1996) (finding actionable retaliation where employer filed false criminal charges against former employee who complained about discrimination); *Gilbert v. Am. Airlines, Inc.*, No. 01 C 3088, 2004 WL 783362, at *5 (N.D. Ill. Jan. 7, 2004) ("a criminal complaint filed by an employer against a former employee can constitute the requisite adverse action"); *Doucet v. Univ. of Cincinnati*, No. 1:05CV148, 2006 WL 2044955, at *69 n.19 (S.D. Ohio July 19, 2006) ("The initiation of a formal disciplinary investigation -- even one that does not result in formal discipline — would satisfy [*Burlington's*] standard."), *aff'd on other grounds*, No. 06-4118, 2007 U.S. App. LEXIS 21570, 2007 WL 2445993, at *9 (6th Cir. Aug. 28. 2007); *Kovacevich v. Vanderbilt Univ.*, No. 3:09-0068, 2010 WL 1492581, at *15 (M.D. Tenn. Apr. 12, 2010) (applying *Burlington* standard and ruling that "Title IX retaliation claims [did] not fail simply because Plaintiff had finished her studies at Vanderbilt's graduate school and had completed her graduate student employment at the time of [retaliatory activity]").
       Defendants thus cannot credibly claim that they may avoid a retaliation claim under Title IX on the basis that at the time of the retaliation Mr. Johnston was not a student. Furthermore, the University's giving Mr. Johnston's name to the FBI as a potential suspect for bomb threats against the University, without any basis to believe he was the perpetrator, is precisely the kind of retaliatory activity these cases held is prohibited.

Plaintiffs' protected activities.  *See Andreoli v. Gates*, 482 F.3d 641, 650 (2007).  If it was, the temporal proximity of the actions of plaintiff and defendant may itself establish the necessary causal link.  *See Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (holding that plaintiff established a *prima facie* case of retaliatory discharge where discharge "followed rapidly").  Lack of temporal proximity is not fatal, however, and the passage of "almost two years" (or indeed any period of time) is "not legally conclusive proof against retaliation."  *Robinson v. Se. Pa. Transp. Auth.*, 982 F.2d 892, 894 (3d Cir. 1993).  "Intervening antagonism" by defendants is also sufficient to show retaliatory animus.  *See Farrell*, 206 F.3d at 280.  The antagonism must have arisen at the time of or after the protected activity.  *See Robinson*, 982 F.2d at 895 (finding that the employer subjected plaintiff to a "constant barrage" of abusive behavior, "all of which occurred soon after his initial complaints and continued until [his] discharge").  Plaintiffs may also demonstrate "inconsistencies" in a defendant's stated reasons for its actions.  *Farrell*, 206 F.3d at 281.

Here, Mr. Johnston has properly alleged that Defendants' adverse actions were motivated by his complaints of discrimination.  Despite living his life as a male during his entire time at the University (during which time he consistently used the men's restrooms and locker rooms without incident, 2d Am. Compl. ¶¶38, 42, 45), not until *after* Mr. Johnston complained to the University officials did he become the victim of discrimination.  Less than a month after complaining, the Defendants retaliated against Mr. Johnston, citing him for the very behavior he had engaged in for the preceding two years.  This temporal proximity is sufficient to state a *prima facie* retaliation claim under Title IX.

Mr. Johnston's allegations reveal that the Defendants attempted to silence him through repeated humiliation and persecution, by expelling him, and ultimately by trying to intimidate

33

him by giving his name to the FBI without any basis.[12]  2d Am. Compl. at ¶84.  This is precisely

the type of retaliation Title IX, the PHRA, and the PFEOA prohibit.

## III.   MR. JOHNSTON HAS ASSERTED A VALID BREACH OF CONTRACT CLAIM AGAINST THE UNIVERSITY

Mr. Johnston has stated a valid claim for breach of contract against the University.

Defendants argue this claim should be dismissed because Mr. Johnston did "not allege that the

non-discrimination policy was provided to Plaintiff as an inducement for Plaintiff's admission to

the University."  MTD at 14.  But Pennsylvania courts have held that, in the university context,

the contract between a university and a student "is comprised of the written guidelines, policies,

and procedures as contained in the written materials distributed to the student over the course of

their enrollment in the institution."  *Swartley v. Hoffner*, 734 A.2d 915, 919 (Pa. Super. 1999)

(*citing Merrow v. Goldberg*, 672 F. Supp. 766, 774 (D. Vt. 1987)).  Contrary to Defendants'

argument, these materials need not be "provided as an inducement for the Plaintiff's admission,"

but may instead be distributed over the course of a student's enrollment. *Id*.

There is no merit to Defendants' characterization of the University's anti-discrimination

policy as a non-contractual, non-binding promise. Pennsylvania courts have held:

> [I]n general, the basic relationship between a student and a private university or college is *contractual in nature*.  The catalogs, bulletins, circulars, and regulations of the institution made available to the matriculant become part of the contract. Questions of discipline, academic matters, and tuition and scholarship disputes have been addressed by courts and resolved on contract principles.

*Gjeka v. Del. County Cmty. Coll.*, Civil Action No. 12-4548, 2013 WL 2257727, at *14 (E.D. Pa.

May 23, 2013) (*citing Barr v. Cmty. Coll. Of Beaver County*, 968 A.2d 235, 238 (Pa. Commw.

Ct.2009)) (emphasis added).  In *Gjeka*, the Court denied the motion to dismiss where the plaintiff

---

12      To be clear, even after Mr. Johnston's expulsion, as Mr. Johnston continued to pursue his rights, both with the University (2d Am. Compl. at ¶¶74-75, 79-81) and with local and state civil rights tribunals, the University continued its campaign of harassment, attempting to silence him.

alleged harassment and breach of contract under the University's anti-harassment policy.  2013 U.S. Dist. LEXIS 73054.

Defendants argue further that, unless university documents are distributed as an inducement for admission, no contract exists.  MTD at 15-16 (citing *Morosetti v. Louisiana Land and Exploration Co.* 522 Pa. 492 (Pa. 1989)).  This mischaracterizes the law:  *Morosetti* provides that "[a] handbook distributed to employees as inducement for employment *may* be an offer and its acceptance a contract."  *Id*. at 495-496.  Whether the handbook was a contract, however, did not turn on whether the handbook "induced" employment.  Rather, the Court found that the policy was not "announced" for all employees.  *Id*. at 495.  That is not the case here, where Defendants have not challenged that the University's anti-discrimination policy was (and still is) in effect and binding on the University.  Indeed, the University's anti-discrimination policy was distributed to all admitted students and represented to be binding and enforceable.  *See* MTD Ex. B ("The Nondiscrimination Policy Publication Statement is to appear in all University . . . brochures . . . concerning . . . admissions").

In any event, whether a contract exists is a factual issue inappropriate for resolution on a motion to dismiss.  *See Curtis v. Cargill Meat Solutions Corp.*, No. 3:CV-06-513, 2006 U.S. Dist. LEXIS 64634, at *10-11 (M.D. Pa. June 16, 2006) (denying motion to dismiss where there remained issues as to whether a contract can be evidenced through an Employee Handbook).[13]

---

13     Notably, the nondiscrimination policy at Exhibit B to Defendants' brief lacks any language even suggesting that it is, as Defendants argue, "subject to change by the University at any time, and at the sole discretion of the University."  MTD at 16.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss.[14]


Dated:  April 2, 2014                    Respectfully submitted,


                                         /s/   Dwayne J. Bensing
                                         Dwayne J. Bensing
                                         (*pro hac vice*, PA ID No. 314092)
                                         Howard H. Stahl (*pro hac vice*)
                                         Mark Siegmund*
                                         Jesse Ryan Loffler*
                                         Roxanne Lepore*
                                         Jessica Klein*
                                         FRIED, FRANK, HARRIS, SHRIVER
                                         & JACOBSON LLP
                                         801 17th Street, N.W.
                                         Washington, D.C.  20006
                                         Telephone No.:   202-639-7000
                                         Facsimile No.:   202-639-7003
                                         Email: howard.stahl@friedfrank.com
                                                 dwayne.bensing@friedfrank.com

                                         * *Not admitted to practice in the Western District of
                                         Pennsylvania*

                                         Ilona M. Turner (*pro hac vice*)
                                         Sasha J. Buchert (*pro hac vice*)
                                         TRANSGENDER LAW CENTER
                                         1629 Telegraph Ave., Suite 400
                                         Oakland, CA 94612
                                         Phone: 415-865-0176, ext. 304
                                         Facsimile: 877-847-1278
                                         Email: ilona@transgenderlawcenter.org
                                                 sasha@transgenderlawcenter.org

---

[14]     If this Court prefers, given the importance of the legal issues presented, the undersigned counsel offers the opportunity for oral argument.

## CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of April, 2014, I will electronically file the foregoing Plaintiffs' Memorandum of Law in Opposition to Defendant University of Pittsburgh's Motion to Dismiss with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following counsel for Defendants University of Pittsburgh:

Martha Hartle Munsch
Reed Smith LLP
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA  15222-2716
Phone: (412) 288-4118
Facsimile: (412) 288-3063
mmunsch@reedsmith.com
*Counsel for Defendant University of Pittsburgh, et al.*

By:    /s/   Dwayne J. Bensing
         Dwayne J. Bensing
         (*pro hac vice*, PA ID No. 314092)

FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON LLP
801 17th Street, NW
Washington, D.C. 20006
Phone: (202) 639-7000
Facsimile: (202) 639-7003
Dwayne.Bensing@friedfrank.com